UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:08-00088 |
| | ) | JUDGE ECHOLS |
| TIMOTHY ORLANDO WHITE | ) | |
| | ) | |

### MEMORANDUM

Defendant Timothy Orlando White filed a Motion to Suppress (Docket Entry No. 23), to which the Government filed a response in opposition (Docket Entry No. 25). The Court held a suppression hearing on September 12, 2008.

### I. FINDINGS OF FACT

On the evening of February 22, 2008, two Metropolitan Nashville police officers from the North Nashville FLEX Unit were patrolling in separate vehicles in the area of 40th Avenue North and Clifton Avenue in North Nashville. Police officers characterize the neighborhood as a high crime and drug trafficking area.

Officer Matthew Grindstaff was driving southbound in an unmarked vehicle on 41st Avenue North between Indiana Avenue and Delaware Avenue. (Def. Ex. 1.) He noticed a green Chevy Malibu (Def. Ex. 6) sitting parallel to 41st Avenue North in a gravel area next to a business that was closed. (Def. Ex. 2.) Although it was dark, he saw two occupants in the car and he noticed that they were not wearing seatbelts. It appeared that the driver was about to pull the car onto 41st Avenue North, also heading southbound. Officer Grindstaff was able to see into the Malibu as he passed it

1

due to the light from the headlights of his own car, the fact that the Malibu did not have tinted windows, and there were street lights and business lights in the area. Having passed the Malibu, Officer Grindstaff radioed Officer Terry, who was patrolling in a marked police vehicle behind him, to inform him that the Malibu's driver was not wearing a seatbelt and the car appeared to be pulling into the street from the gravel area.[1]

About the same time, Officer Terry turned the corner from Indiana Avenue southbound onto 41st Avenue North heading toward Delaware Avenue. The Malibu was already rolling southward in front of him, and Officer Terry was approximately fifty (50) feet from the point where the car had pulled out from the gravel area. He pulled within one to two car lengths behind the Malibu and observed that the driver and front seat passenger were not wearing seatbelts. He knew the seatbelts were not in use because the shoulder straps were not pulled across the seats. He activated his blue lights to stop the car for a seatbelt violation.

The driver was slow to stop the car. The Malibu rounded the corner of 41st Avenue North and headed east on Delaware Avenue. About halfway down Delaware Avenue, the car pulled over across from

---

[1]Tennessee state law provides that "[n]o person shall operate a passenger motor vehicle on any highway . . . in this state unless such person and all passengers four (4) years of age or older are restrained by a safety belt at all times the vehicle is in forward motion." Tenn. Code Ann. § 55-9-603(a). The statute also provides that a "law enforcement officer observing a violation of this section shall issue a citation to the violator, but shall not arrest or take into custody any person solely for a violation of this section. Id. § 55-9-603(f)(1).

2

an alley. There were residences and street lights in the area where the car stopped. Officer Grindstaff turned around and returned to the scene of the traffic stop to provide backup assistance.

The traffic stop occurred at 7:53 p.m. At the suppression hearing, the defense raised an issue concerning the exact time of the traffic stop. In the incident report (Def. Ex. 3) and the arrest report (Def. Ex. 4), Officer Terry entered the time of the traffic stop as "2001" or 8:01 p.m. The police dispatch log indicates that Officer Terry first requested an arrest records check at "19:57" or 7:57 p.m., four minutes before the time of the traffic stop as stated on the police reports.

Officer Terry explained that time discrepancies occur with some regularity because the time displayed on the laptop computer in his police car often does not match the time on the official police dispatch log. Also, the laptop refreshes automatically and when he can no longer determine the time of an event by looking at his laptop, he must contact the police dispatcher to ask what time the event occurred.

Officer Terry first learned of the discrepancy between his reports and the dispatch log two days before the suppression hearing when he met with the prosecutor to prepare for his testimony. At that time he contacted the police dispatcher and learned that he initially called in the traffic stop at 7:53 p.m. on February 22, 2008.

3

During his initial contact with the dispatcher on February 22, as is routine practice, Officer Terry notified the dispatcher he had made a vehicle stop, he provided his location, and he provided the license tag number of the stopped vehicle. All of this information was given to the police dispatcher for officer safety. Officer Terry denied, but then later said he did not recall, contacting the police dispatcher to run a car license check prior to the traffic stop. The dispatcher does not automatically check a car license number provided and does so only if the officer requests such a check.

The Court finds that Officer Terry's testimony is credible and the Court accepts it. Any discrepancy in the exact time of the traffic stop has been sufficiently explained. The Court further finds that the variance of eight (8) minutes between the actual time of the stop and the time as recorded in the police reports completed later is of little to no significance in deciding the larger issues presented for decision.

Turning back to the traffic stop, Officer Terry, having notified the police dispatcher of the stop, walked toward the driver's side window of the Malibu. A light was on inside the car and Officer Terry also shined his flashlight into the passenger compartment as he walked from the back of the car to the driver's door. On the floor behind the front passenger seat he spotted a plastic sandwich bag with the corner torn off. As a result of his training and experience in narcotics, Officer Terry knew that a plastic sandwich bag with a torn-off corner (a "corner bag") can be

4

used to package cocaine or marijuana.  The corner bag he spied was hazy, as if it had cocaine residue in it.  Seeing the corner bag and considering he had made drug arrests in the same area the day before, Officer Terry became suspicious.  His concern for officer safety was also heightened because in his experience it is not uncommon to find a weapon with illegal narcotics.

Officer Terry approached the driver's door.  He confirmed once again that the driver and his passenger were not wearing seatbelts.  He asked the driver to provide his driver's license, registration and proof of insurance.  The driver, defendant Timothy White, produced his driver's license.  Officer Terry then returned to his patrol car and asked the police dispatcher to run a check on White's driver's license.  The police dispatch log reflects that Officer Terry made this call to dispatch at 7:57 p.m., four minutes after the initial stop.  (Def. Ex. 5.)  The driver's license check was negative, but Officer Terry did not return the driver's license to White.

Instead, Officer Terry returned to the driver's side of the Malibu and asked White to step out of the vehicle.  As White did so, Officer Terry saw two smoked marijuana blunts between the driver's door and the driver's seat.  Officer Terry asked White if he lived in the area and if he had anything illegal on his person.  White replied, "No."

Having discovered the marijuana blunts and the "corner bag" in the car, Officer Terry searched White's person.  In White's left front jeans pocket, Officer White found a clear bag containing

5

eleven (11) .38 caliber bullets. In White's right front jeans pocket, Officer Terry found a rolled up store receipt containing 1.8 grams of marijuana. Officer Terry retrieved the corner bag from the floor behind the front passenger seat and conducted a field test on the residue, finding it positive for cocaine. Officer Terry placed the recovered items on the trunk of the Malibu, handcuffed White, and placed White in the back of the marked patrol car. Officer Terry gave White the <u>Miranda</u> rights from memory. White did not make any statements at that time.

Meanwhile, Officer Grindstaff had approached the passenger side of the vehicle, shining his flashlight into the car. He also observed the corner bag on the floor behind the front passenger seat and knew it was consistent with the presence of cocaine. Officer Grindstaff determined the passenger's name was Anthony "Tony" Hyde. Upon looking closely at Hyde, Officer Grindstaff recognized him from prior police dealings. Officer Grindstaff asked Hyde to get out of the vehicle and searched him, but no contraband was found on Hyde. Officer Grindstaff placed Hyde in his unmarked police car.

Officer Terry contacted the police dispatcher to request an arrest records check on Hyde at 8:01 p.m., eight (8) minutes after the stop. (Def. Ex. 5.) Officer Terry apparently repeated his request for an arrest records check on White at 8:23 and 8:24 p.m. (Def. Ex. 5.)

Having seen the bag of bullets taken from White's pocket and aware that the residue in the corner bag field-tested positive for

6

cocaine, Officer Grindstaff searched the interior of the Malibu. Under the driver's seat he found a Smith and Wesson .38 caliber revolver loaded with six (6) bullets. The ammunition seized from White's pocket matched the ammunition in the gun. Officer Grindstaff took photographs of the evidence. Approximately ten to fifteen minutes passed from the time of the traffic stop to seizure of the weapon.

Hyde's father appeared on the scene. Officer Terry asked Hyde if the gun found under the driver's seat was his, but Hyde denied the gun belonged to him. White then offered, "There's nothing in the car that's his–it's mine."

Thereafter, Officer Terry ran a criminal records check on White. (Def. Ex. 5.) Discovering a prior felony criminal history, Officer Terry charged the defendant as a felon in possession of a firearm and for simple possession of marijuana and cocaine.

Hyde testified for the defense that he was at his aunt's house near 41St Avenue North and Delaware for approximately two hours on the evening of February 22, 2008. He called White from his cell phone and asked him to come to the house to pick him up. White called Hyde from the street when he arrived at the location. Hyde then left the house, crossed the street, and got in the Malibu, which was parked on the street out of the lane of traffic, but not on the gravel lot as Officer Grindstaff said. Hyde told White that as he crossed the street he observed three police cars with headlights on and moving slowly behind the Malibu. Hyde put on his seatbelt and observed that White already had his seatbelt buckled.

7

According to Hyde, he always checks that everyone in a car is wearing a seatbelt.

Hyde testified one police car rolled slowly by the Malibu while it was parked. White then pulled the Malibu into the same lane of traffic. Five to six seconds later a following police car turned on blue lights and pulled them over. White stopped the car immediately. Hyde did not see White violate any law. He denied any lights were on inside the passenger compartment. When he initially got into the car, the dome light lit up, and when the officers approached both sides of the car, opened the doors, and asked them to step out, the dome light lit up again. He did not hear White give police officers permission to search his person or the Malibu, but he admitted that he was being questioned by Officer Grindstaff and he did not hear everything that was said between White and Officer Terry. The officers did not have a warrant for White's arrest.

On cross-examination Hyde testified he has a prior felony conviction for possession with intent to sell less than five grams of crack cocaine. White is his best friend and they spent time together every day. During White's pretrial detention, Hyde has talked with White approximately ten times and on three occasions they talked about White's case. On those occasions when they discussed the case, they talked about telling the truth, and Hyde told White he "hopes he makes it and comes out." Hyde appeared in court pursuant to a defense subpoena.

8

The Court finds that Hyde's testimony is not credible and the Court does not rely on it.  Hyde claimed he observed three marked police cars moving slowly behind the Malibu when he crossed the street, but only two police cars, one marked and one unmarked, were involved in the traffic stop.  Officer Grindstaff did not testify that he saw Hyde cross the street and get into the Malibu, and the Court finds that the two men were already in the parked car when Officer Grindstaff drove by and noticed them.  The Court also does not accept Hyde's testimony that when he got into the Malibu he immediately put on his seatbelt and White was already wearing his. Officers Grindstaff and Terry both observed that the men were not wearing seatbelts prior to the stop, and the Court credits their testimony over Hyde's.  The Court also accepts the officers' testimony that an interior light was on in the passenger compartment of the Malibu at the time of the stop.  The Court suspects the substance of Hyde's expected testimony was discussed by White and Hyde in their recent telephone conversations, and the Court believes that Hyde's testimony is tainted by a desire to help his best friend "beat the charge" by giving favorable testimony at the suppression hearing.

## II.  CONCLUSIONS OF LAW

A temporary detention of individuals by police during a traffic stop, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 810 (1996).  An officer may stop a vehicle so long as he has probable

9

cause to believe that a traffic violation has occurred, even if his true reason for the stop is motivated by something other than the traffic offense itself. Id.; United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993) (en banc). Probable cause is a flexible, commonsense standard and requires, in the totality of the circumstances, that the facts available warrant an officer of reasonable caution to believe that criminal activity is occurring. Id. at 392. An officer also has authority to stop a vehicle for a brief investigative detention if the officer has a reasonable, articulable suspicion that criminal activity is afoot. United States v. Simpson, 520 F.3d 531, 540-541 (6th Cir. 2008).

Based on the Court's factual findings that the Malibu's occupants were not wearing seatbelts as White drove the car southward on 41st Avenue North, the Court concludes that Officer Terry had probable cause to stop the Malibu for a violation of Tennessee's seatbelt law. Tenn. Code Ann. § 55-9-603(a) & (f)(1); Ferguson, 8 F.3d at 392 (noting probable cause is reasonable grounds for belief, supported by less than prima facie proof but more than a mere suspicion). While Officer Terry had statutory authority to give the driver a citation for the seatbelt violation, he could not make an arrest based on the seatbelt statute.

Upon approaching the stopped Malibu, however, Officer Terry noticed the "corner bag" on the rear floorboard. In light of his experience and training in narcotics cases, he associated the "corner bag" with packaging cocaine. The baggie was hazy as if it

10

contained cocaine residue. Officer Grindstaff also noticed the "corner bag" when he approached the passenger side of the car.

Officer Terry could ask White to step out of the car, see Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977), and when White did so, Officer Terry spotted the two smoked marijuana blunts between the door and the driver's seat. Due to the presence of marijuana and what appeared to be cocaine residue in the car, Officer Terry had probable cause to arrest White for possession of a controlled substance, and incident to that arrest, Officer Terry could lawfully search White's person and the Malibu. See United States v. Puckett, 422 F.3d 340, 343 (6th Cir. 2005) (officer had probable cause to search upon smelling and seeing marijuana in car); United States v. Williams, 483 F.3d 425, 430 (6th Cir. 2007) (during custodial arrest officer may search person and area within person's immediate control without warrant); Campbell v. Miller, 499 F.3d 711, 717 (7th Cir. 2007) (relying on United States v. Robinson, 414 U.S. 218 (1973)).

Upon searching White, Officer Terry discovered a clear bag containing eleven rounds of .38 caliber ammunition. He field-tested the residue in the "corner bag" and it was positive for cocaine. Thereafter Officer Grindstaff searched the car and found the .38 caliber revolver under the driver's seat where White had been sitting. All of the evidence seized from the vehicle and from White is admissible in evidence.[2] White's statement, "There's

---

[2] The traffic stop was not unreasonably prolonged because only a few minutes passed from the moment Officer Terry activated his

11

nothing in the car that's his-it's mine[,]" is also admissible in evidence because Officer Terry had given White the Miranda rights, the police officers did not subsequently ask White any questions, and White spontaneously and voluntarily made the incriminating statement to eliminate his friend, Tony Hyde, from any police suspicion that Hyde possessed the firearm.

### III. CONCLUSION

For all of the reasons stated, the defendant's Motion To Suppress (Docket Entry No. 23) will be denied.  The traffic stop based on a seatbelt violation was lawful, and within minutes of approaching the car Officer Terry had probable cause to arrest White for possession of a controlled substance.  Having probable cause to arrest, Officer Terry could search the Malibu and White's person incident to that arrest.  All evidence seized during the searches are admissible at trial, as is White's incriminating statement, made after Officer Terry gave him the Miranda rights.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

---

blue lights to pull the Malibu over and his determination that probable cause existed to arrest White for possession of a controlled substance.  Considering all of the circumstances, the scope and length of the traffic stop did not transform the stop into an unconstitutional seizure.  See United States v. Ellis, 497 F.3d 606, 612-614 (6th Cir. 2007).

Case 3:08-cr-00088   Document 33   Filed 09/19/08   Page 12 of 12 PageID #: 64